IN THE DISTRICT COURT FOR CREEK COUNTY
STATE OF OKLAHOMA

(1) MARGARET JOHNSON, as co-administrator for the Estate of Matthew Kelley,

    Plaintiff,

v.

(2) BOARD OF COUNTY COMMISSIONERS FOR CREEK COUNTY, OKLAHOMA,

(3) STEVE TOLIVER, in his official and individual capacity as sheriff of Creek County,

(4) RANDAL ARNOLD JR.,

(5) DUSTIN THOMAS,

(6) KEVIN TAYLOR,

(7) CITY OF SAPULPA,

    Defendants.

Case No.: B-CJ-2012-16

FILED IN DISTRICT COURT
CREEK COUNTY SAPULPA OK

JUL 09 2013

TIME _____
Amanda VanOrsdol COURT CLERK

## AMENDED PETITION

COMES NOW, Plaintiff Margaret Johnson as co-administrator for the Estate of Matthew Kelley, and for her cause of action against the above-named Defendants, would state as follows:

1. Margaret Johnson is the co-administrator of the Estate of Matthew Kelley as set forth in Creek County District Court Case No. PB-2011-67.

2. Defendant Board of County Commissioners of Creek County, Oklahoma ("Board") is the legislative body for Creek County, Oklahoma. Defendant Steve Toliver ("Toliver") was the

Sheriff of Creek County, Oklahoma at the time of the incident and the final policymaker for the Sheriff's department. Defendant Randal Arnold Jr. ("Arnold") is a Creek County Sheriff's deputy employed by Defendant Board. Defendant Dustin Thomas ("Thomas") is a Creek County Sheriff's deputy employed by Defendant Board. Defendant Kevin Taylor ("Taylor") is a Creek County Sheriff's deputy employed by Defendant Board. Defendant City of Sapulpa ("City") is a municipal entity situated in both Creek and Tulsa Counties.

3. The acts complained of herein occurred in Creek County, Oklahoma making jurisdiction and venue in this Court proper, the Defendants were acting under color and authority of state law at all times relevant hereto, and Plaintiff has timely complied with all requirements set forth in the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 *et seq.*

4. On July 10, 2011, Board's employees Arnold and Thomas responded to a call at 42nd West Avenue and 61st St. South. Upon their arrival, Arnold and Thomas meet with Plaintiff's decedent and his uncle, who alleged that Kelley had violated a protective order. Arnold and Thomas were speaking with Kelley outside his front door.

5. While speaking with Kelley, Arnold observed that Kelley was "sweating profusely from his head and chest and talking fast." Arnold had to ask Kelley to repeat things at times because he was pacing around and talking too fast. Thomas recognized Kelley from previous calls, and observed that Kelley "was not making sense in what he was saying."

6. Arnold and Thomas continued speaking with Kelley who turned and entered his home. Randal and Thomas immediately chased Kelley through the front door and into the kitchen.

7. While in the kitchen, Thomas launched Taser probes into Kelley's back. Arnold claimed that application of the Taser caused Kelley to turn and use the kitchen counter for support while Thomas claimed the Taser caused Kelley to "stiffen up." While Kelley was still under the

2

influence of the Taser, Thomas put Kelley in a headlock as Arnold grabbed his arm.

8. With Thomas holding Kelley in a headlock, and Arnold having Kelley by the left arm, the Defendants did not place Kelley in handcuffs. Instead, Arnold and Thomas took Kelley to the ground. Kelley would only have his right arm to soften his landing as the full weight and force of the two deputies brought him to the ground.

9. Arnold and Thomas claim that they began issuing commands for Kelley to perform voluntary movements despite knowledge that Tasers can disorient a subject and may cause a person to lose coordination and control of their muscle systems, and despite knowledge that both deputies had forcefully taken Kelley to the ground with little means of protecting himself from the fall.

10. With Arnold and Thomas continuing to apply force, and likely on top of Kelley, Thomas applied the Taser in the drive-stun mode. Thomas claimed the Taser had no effect, and he deployed pepper spray into Kelley's eyes. Thomas claimed the pepper spray had no effect either.

11. Arnold claimed that Thomas put Kelley back in a neck restraint. At some point Thomas observed Kelley's right forearm, but rather than immobilize the arm and apply restraints, Thomas reached for an asp and struck Kelley in the arm. Kelley naturally withdrew his arm upon being struck. After releasing Kelley from the neck restraint, Thomas began applying knee strikes to Kelley's side.

12. Thomas claimed the knee strikes were not effective. Thomas then used his Taser for a third time. Again, Thomas claimed the Taser had no effect on Kelley.

13. Arnold claimed he was continuing to struggle with Kelley when he used his Taser and deployed probes into Kelley's back for a five second cycle. Once the cycle completed, Arnold claimed that Kelley resumed a noncompliant posture. Arnold contends that Defendant Taylor then applied his Taser in drive-stun mode into Kelley's upper back.

14. When Taylor arrived, he observed that Kelley had a cut above his eye and was bleeding. Taylor also observed that Kelley was talking and screaming, and that he had "an unusual amount of strength." Taylor also observed that the Taser had no effect.

15. Taylor claimed that Thomas "advised to tase him again, at which Deputy Arnold tased him in the stomach area." Taylor claimed this caused Kelley to go "to the floor" where Thomas placed Kelley in restraints.

16. According to a Press Release issued by the Creek County Sheriff's Department, Randal and Thomas followed Kelley into his kitchen where they both "deploy[ed] a Taser several times . . . with no effect". According to the Release, Randal and Thomas then began using "Pepper Gas" and took Kelley to the ground where he was handcuffed "for safety and transport".

17. According to a Press Release issued by the Oklahoma State Bureau of Investigation ("OSBI"), only "[o]ne of the deputies deployed his taser . . . [which] did not result in compliance." "[Randal and Thomas] then put Kelley on the ground and tried to handcuff him but Kelley continued to fight." The OSBI report states that Kelley was tased again and pepper sprayed. The OSBI states that a third deputy arrived to assist in handcuffing Kelley, who was carried from the home because he "continued to fight."

18. Both Press Releases omit all details of the injuries that the deputies inflicted upon Kelley. Upon information and belief, in addition to the use of pepper spray and multiple taser deployments, Defendants Randal, Thomas and Taylor repeatedly struck Kelley multiple times with an asp or rod, and/or their feet and fists. The injuries inflicted by the deputies are depicted below:















19. After handcuffing Kelley, Defendants Randal, Thomas and Taylor, along with employees of Defendant City, carried Kelley's motionless body from the home by his arms and legs and put him in the back of a patrol car. Surveillance video of the incident does not show Kelley

7

struggling or moving independently, and there is nothing to suggest that Kelley was capable of ambulating.

20. Despite the obviousness of the injuries to Plaintiff's decedent, and knowledge that Plaintiff's decedent was in such poor condition that he could not be admitted to a jail facility, employees of City and Board mingled around their patrol cars for approximately 25 minutes.

21. Defendants' employees did not summon medical attention for Kelley at the scene, they did not closely monitor his condition while in the back of the patrol car, and their disregard for the consequences of his injuries ultimately delayed transport to a medical facility.

22. After socializing around the patrol cars for approximately 25 minutes, Arnold eventually transported Kelley to St. John's Hospital in Sapulpa. According to the OSBI, Arnold transported Kelley to the hospital "since Kelley had blood on his body – possibly belonging to a deputy." The implication from the OSBI report, when compared to the injuries actually suffered by Kelley, suggests that the deputies were incompetent in their evaluation of Kelley's injuries, never closely examined or monitored Kelley, or the assertion was simply manufactured to justify the deputies' assault by making it appear that Kelley caused some injury to a deputy.

23. Kelley was pronounced dead on arrival despite a representation from the transporting employee that Kelley was responsive to verbal commands just moments after he arrived at the hospital.

24. Upon information and belief, the failure to immediately summon first responders or promptly transport Plaintiff's decedent to a medical facility increased the risk of harm that Plaintiff's decedent suffered from his injuries and hastened or aggravated the effect of those injuries which ultimately denied medical providers of the best opportunity to save the life of Plaintiff's decedent.

25. Defendants Board and City owed a negligence-based duty of care to provide Plaintiff's decedent with prompt access to medical care based upon the existence of a special custodial relationship, and observations and knowledge regarding behaviors and injuries that would lead a reasonable person to conclude that Plaintiff's decedent required prompt medical attention. Defendants Board and City breached that duty by waiting approximately 25 minutes before attempting to transport Plaintiff's decedent for medical attention. As a result, Plaintiff's decedent lost the best chance of surviving his injuries for which Defendants Board and City are liable under state law.

26. Defendants Arnold, Thomas and Taylor had actual knowledge that Plaintiff's decedent exhibited behaviors and conduct that led each of them to conclude that Plaintiff was acting irrationally and consistent with drug usage, and each of them had actual knowledge that Plaintiff suffered multiple Taser applications, multiple strikes with batons or asps, the use of pepper spray, use of force techniques with the risk of positional asphyxia, knee strikes, and corresponding injuries to the face and head and obvious bleeding. Despite this knowledge, and with deliberate indifference to the serious medical needs of Plaintiff's decedent, Defendants Arnold, Thomas and Taylor failed to take reasonable steps to secure prompt medical attention for Kelley's injuries with deliberate indifference to the consequences and for which Arnold, Thomas and Taylor are liable under the Fourteenth Amendment to the U.S. Constitution, actionable through 42 U.S.C. § 1983.

27. Defendant Board owed a negligence-based duty of care to Plaintiff's decedent to only use such force as a reasonably prudent police officer would use in light of the circumstances confronting the officer under an objective standard. The force applied by Arnold, Thomas and Taylor exceeded the amount of force necessary under these circumstances which included an unarmed person accused of a misdemeanor, who did not pose an immediate threat to anyone, where

9

there was no exigency of the moment, and where the Board's employees had superior numbers, size and weaponry at their disposal, and alternative means of accomplishing the arrest. As a result, Plaintiff's decedent suffered life-threatening injuries for which Defendant Board is liable under a state-based negligence theory and pursuant to Art. 2 § 30 of the Oklahoma Constitution, actionable through *Bosh v. Cherokee County Governmental Building Authority*, 2013 OK 9, and the Fourth Amendment to the U.S. Constitution, actionable through 42 U.S.C. § 1983.

28. Defendant Board owed a negligence-based duty to properly train its employees in policies and practices that govern the use of force, and Defendants Board and City owed a duty to properly train their employees to observe, evaluate and properly respond to injuries sustained by those in custody. Upon information and belief, Defendants Board and City breached their respective duties by failing to properly and adequately train their employees who encountered Plaintiff's decedent in proper use of force and restraint tactics, drug recognition, injury observation, excited delirium and medical responsiveness. Defendants' failure to properly and adequately train their employees was the direct and proximate cause of the injuries and death suffered by Plaintiff's decedent and for which the Board and City are liable under state law.

29. Upon information and belief, Defendant Sheriff Toliver knew that deputies frequently encounter individuals in an agitated state, and that such individuals may be under the influence of drugs. Upon information and belief, Toliver knew that deputies may be called upon to arrest those individuals, and that such arrests may require the use of an extraordinary amount of force. Upon information and belief, Toliver knew that such circumstances substantially increase the risk that an arrestee would require prompt medical attention to prevent the arrestee from suffering the effects of excited delirium.

30. The obviousness of the risk presented by excited delirium required that Toliver

implement adequate policies and provide adequate training to ensure that deputies could effectively recognize and respond to arrestees suffering the effects of excited delirium. Upon information and belief, Defendant Toliver failed to provide adequate training regarding the effects of excited delirium, and that such failure directly caused or contributed to the death of Plaintiff's decedent in violation of his rights as secured by Fourteenth Amendment to the U.S. Constitution, actionbale through 42 U.S.C. § 1983.

31. That as a direct and proximate result of the conduct detailed above, Plaintiff's decedent suffered bodily injury and death and, Plaintiff and the children of Plaintiff's decedent have endured and continue to endure both mental pain and suffering, loss of the enjoyment of life, and have suffered further damages all of which will be more particularly proven at trial.

WHEREFORE, all premises considered, Plaintiff respectfully requests the Court enter judgment in her favor in an amount that exceeds $75,000.00.

Respectfully submitted,

BRYAN & TERRILL

_____
J. Spencer Bryan, OBA # 19419
Steven J. Terrill, OBA # 20869
9 East 4th St., Suite 600
Tulsa, OK 74103
Tele: (918) 935-2777
Fax: (918) 935-2778
jsbryan@bryanterrill.com
*Attorneys for the Estate of Matthew Kelley*

And

GARRETT LAW CENTER, PLLC

Amber N. Peckio Garrett, OBA #19908
D. Mitchell Garrett, OBA # 20704
401 S Boston Ave, STE 2201
Tulsa, OK 74103
Telephone – (918) 895-7216
Facsimile – (918) 895-7217
mitchell@garrettlawcenter.com
ATTORNEYS FOR THE PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of July 2013, a true and correct copy of the above and foregoing was mailed, to the following counsel of record:

Ben Reed
Thomas LeBlanc
1 W. 3rd St., Ste. 900
Tulsa, OK 74103

Scott Wood
2409 E. Skelly Drive, Suite 200
Tulsa, OK 74105

Amber N. Peckio Garrett
D. Mitchell Garrett
401 S Boston Ave, STE 2201
Tulsa, OK 74103

_____
Steven J. Terrill